# United States Court of Appeals
## For the First Circuit

No. 01-2334

UNITED STATES OF AMERICA,

Appellee,

v.

CESAR ROBERTO CASTRO-GOMEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Boudin, Chief Judge,

Torruella and Howard, Circuit Judges.

Lydia Lizarribar-Masini for appellant.
Thomas F. Klumper, Assistant United States Attorney with whom
H.S. Garcia, United States Attorney and Sonia I. Torres, Assistant
United States Attorney were on brief, for appellee.

February 23, 2004

**HOWARD**, **Circuit Judge**.  On January 19, 1997, César Castro Gómez was apprehended several miles off the coast of Puerto Rico while piloting a boat containing two other passengers and some 762 kilograms of cocaine.  A jury subsequently convicted him of possession, conspiracy to possess with intent to distribute, and attempted importation of the cocaine -- offenses for which he was sentenced to concurrent life terms because of his significant criminal history.  In this appeal, the principal issue is whether the district court erred in declining to instruct the jury to consider whether Castro unwillingly participated in these crimes because he was under threats sufficiently grave to ground an affirmative defense of duress.  See, e.g., United States v. Arthurs, 73 F.3d 444, 448 (1st Cir. 1996) (duress occasioned by "1) an immediate threat of serious bodily injury or death, 2) a well-grounded belief that the threat will be carried out, and 3) no reasonable opportunity to escape or otherwise to frustrate the threat" can exonerate one from liability for otherwise criminal conduct).

The district court denied Castro's request for a duress instruction because it found the evidence insufficient to support a finding that Castro lacked an opportunity to escape the threatening situation.  See United States v. Bailey, 444 U.S. 394, 415 (1980).  We begin our discussion of Castro's challenge to this ruling by describing the evidence relevant to the putative duress

-2-

defense in the light most favorable to Castro. See Arthurs, 73 F.3d at 448; United States v. Coady, 809 F.2d 119, 122 (1st Cir. 1987). Our review is de novo. See United States v. Maxwell, 254 F.3d 21, 26 (1st Cir. 2001).

In early January 1997, Luis Rafael Santiago Rodríguez was having trouble securing a captain for the "go-fast" boat that he hoped to use to retrieve a load of cocaine that was to be dropped into the sea by his Colombian suppliers. At that time, Castro was working in a legitimate business for Marcelino Pérez Soto, one of Santiago's confederates. Knowing that Castro was capable of driving the go-fast boat skillfully, Santiago had Pérez arrange a meeting between himself and Castro (as well as Pérez and Raul Orlando Palacios-Díaz, an intimidating henchman of Santiago's) at a pizza parlor. At the meeting, Santiago asked Castro to pick up the load of cocaine for him. Castro, who had served significant jail time for drug trafficking offenses and was then under supervised release, refused. Santiago begged Castro to reconsider, but Castro was adamant.

Within two or three days, Pérez appeared at Castro's house and told him that Santiago would be along momentarily. Santiago and Palacios-Díaz arrived a few minutes later. Santiago told Castro that Castro had to solve his transportation problem. Castro felt threatened and agreed to get into Santiago's vehicle. The group drove to Fajardo. On the way, Castro saw that Santiago

-3-

and Palacios-Díaz were armed. Upon arrival in Fajardo, Santiago told Castro to bring him the load of cocaine or "go to hell." As he said this, Santiago was touching his gun. Castro understood Santiago to be making a death threat.

Under the circumstances, Castro saw no alternative but to comply with Santiago's directive. Castro and the armed Palacios-Díaz boarded the go-fast boat and headed out towards the designated drop point, which was approximately 90 miles off the coast of Puerto Rico. When the boat was some 60 miles out, Castro pretended that they had arrived at the drop point and began to circle as if he were waiting for the plane. At nightfall, Castro drove the boat back to Puerto Rico. The boat was met by a group of men including an irate Santiago, who had received word from the Colombian pilots that nobody was at the drop point. After some angry discussion during which Castro feared that he would be killed, the group dispersed.

Several days later, on January 18, 1997, Pérez called and told Castro to meet him at the same pizza parlor where the first meeting with Santiago had taken place. Castro assumed that the episode earlier in the week "was over with" and complied. Soon after Castro's arrival, Santiago and Palacios-Díaz showed up. Santiago informed Castro in a threatening manner that Castro would be making another attempt to retrieve the load of cocaine on the following day. At first, Castro refused, but Santiago and

Palacios-Díaz soon intimidated him into going along with the plan. Santiago ordered Palacios-Díaz to stay overnight with Castro at Castro's house and to make sure that Castro showed up the next day.

The following morning, Santiago picked up Castro and Palacios-Díaz at Castro's house. Again, the group drove to Fajardo, where Castro, the armed Palacios-Díaz, and Pérez boarded the boat and headed out towards the rendezvous point. This time, the Colombian aircraft spotted the boat and dumped 22 bales of cocaine into the sea. The group retrieved the bales and began to make its way back toward Puerto Rico. But the Coast Guard spotted the vessel, boarded it, discovered the cocaine, and arrested the vessel's occupants.

Castro contends that the scenario just described could support a reasonable finding that his presence in the boat was procured by duress, and that the district court therefore erred in rejecting his request that the jury be instructed to consider whether he had established duress as an affirmative defense. As previously noted, the court predicated its refusal on a determination that the jury could not reasonably find that Castro lacked an opportunity to escape Santiago's coercion. See Arthurs, 73 F.3d at 448. Among the evidence on which the court focused in reaching its determination was Castro's choice to go to the pizza parlor a second time when Pérez called him:

> Also there were opportunities that [Castro] had not to get involved, at least in

the second [trip to sea] . . . . . [H]e had experience of what happened in the first [trip to sea], again the evidence showed that the same pattern of meetings and conversations that took place in the first attempt two or three days earlier was taking place in the second attempt. For example, he was home minding his own business, he got called by Marcelino Pérez and he told him he wanted to see him at [the pizza parlor]. He could have said, "I'm not going, what's it for, is [Santiago] going to be there? I am not going to do this" and he could have asked Marcelino, "why do you want to see me? No, I'm not going. Explain to me on the phone" instead of submitting himself to a situation where he could again meet with Santiago.

We see no error in this determination.

In assessing whether a defendant has established sufficient grounds to mount a duress defense, courts do not examine the defendant's subjective perceptions about whether the threat was likely to be acted upon or whether escape was possible. Rather, as suggested by our use of the qualifiers "well-grounded" and "reasonable" in describing the elements of the defense, see Arthurs, 73 F.3d at 448, the inquiry hypothesizes a defendant of ordinary firmness and judgment and asks what such a defendant was likely to have experienced or how such a defendant was likely to have acted, see 1 LaFave & Scott, Substantive Criminal Law § 5.3, at 619, 621 & n.30.1 (West 1996 & 2003 Supp.). Here, we think the district court correctly concluded that no person of ordinary firmness and judgment who wished to escape coercion of the type that Castro had so recently experienced would have returned to the

-6-

pizza parlor upon Pérez's second summons. In our view, a reasonable person genuinely wishing to escape the predicament Castro described would have foreseen the likelihood that the summons pertained to the as-yet uncompleted importation scheme. He would not have gone to the pizza parlor, but instead would have summoned law enforcement officials to protect himself and his family. See id. at 619 n.33 (collecting cases where a duress defense was denied because the defendant had an opportunity but failed to avail himself of government protection); id., 2003 Supp. at 125 n.33; cf. id. at 622 ("It is . . . generally recognized that a defendant can lose [a duress] defense by his own fault in getting into the difficulty. Thus, . . . the duress defense is unavailable if the defendant recklessly placed himself in a situation in which it was probable that he would be subjected to duress."). Castro's failure to do so deprived him of the opportunity to press a duress defense.

Castro makes three additional arguments that warrant only a brief word. Castro asserts that the district court erred in permitting a government witness to testify about the street value of the cocaine. But the testimony was relevant to, inter alia, whether Castro might have had a motive other than duress for participating in the crime. And in any event, the evidence against Castro was so overwhelming that this testimony was extraordinarily unlikely to have impacted the jury's deliberations. Castro also

contends that the court erred in denying his motion to issue a writ of habeas corpus ad testificandum for Elliot Garcia Agosto, a contemplated defense witness who was incarcerated at the time of Castro's trial. The record reveals, however, that the court allowed Castro's motion on reconsideration. This argument is thus built on a faulty foundation. Finally, Castro perfunctorily asserts that, in calculating his criminal history, the court erred in failing to treat his prior sentences as "related" and thus not separately countable. Because this argument was not raised below and is presented on appeal in a sketchy and wholly unsubstantiated manner, we will not address it. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

**Affirmed**.