**Robert PLUMMER**

v.

**TOWN OF SOMERSET, Joseph C. Ferreira, International Brotherhood of Police Officers Local 518, and Michael Williams.**

Civil Action No. 06–11700–RGS.

United States District Court,
D. Massachusetts.

March 9, 2009.

Jennifer S. Bunce, Gareth W. Notis, Morrison, Mahoney, & Miller LLP, Valerie A. McCormack, Louison, Costello, Condon & Pfaff, LLP, John J. O'Connor, Peabody & Arnold LLP, Boston, MA, Margaret A. Rubino, Rafanelli & Kittredge, PC, Acton, MA, for Defendants.

Robert S. Sinsheimer, Denner Pellegrino LLP, Boston, MA, for Plaintiff.

## MEMORANDUM AND ORDER ON TOWN OF SOMERSET AND JOSEPH C. FERREIRA'S MOTION FOR SUMMARY JUDGMENT

STEARNS, District Judge.

Robert Plummer, a former Somerset policeman, brought this lawsuit against the Town of Somerset and Joseph Ferreira, the Chief of Police, alleging wrongful termination and violations of the right to "substantive" due process, pursuant to 42

U.S.C. § 1983 and Mass. Gen. Laws ch. 12, § 11I. At issue is Plummer's claim of interference by the Town and Chief Ferreira with his intimate relationship with Susan Tanner,[1] a woman he met while serving as a police officer (and to whom he later became engaged). The court previously dismissed all claims against Chief Ferreira in his official capacity and all but the section 1983 claim against the Town. Defendants now move for summary judgment on the claims that remain. A hearing on defendants' motion was held on February 24, 2009.

## FACTUAL BACKGROUND

The undisputed facts, in the light most favorable to Plummer as the non-moving party, are as follows. Plummer was hired as a patrolman in 2000. Among other duties, Plummer was assigned to serve as the department's domestic violence officer. In that capacity, he became reacquainted with Tanner, a former high school classmate.

From 2003 through 2005, Tanner was addicted to illegal drugs. Plummer arranged for her to become enrolled in a drug rehabilitation program. In 2004, Tanner was arrested for prostitution (the charge was later dropped). In the summer of 2005, she was arrested for larceny. Plummer was aware of Tanner's pending criminal charges.

Sometime in July or August of 2005, Plummer moved from his marital home into the home of Tanner's family. Tanner returned to the family home in August after completing drug rehabilitation. She and Plummer then began an intimate relationship.

On August 24, 2005, a Somerset patrolman reported seeing Plummer with a "crack" pipe in the police locker room. When questioned about the incident later that day, Plummer claimed that the patrolman had mistaken his glass cigarette lighter for a crack pipe. When asked, he admitted to being involved in a relationship with Tanner. He also stated that he had seen a crack pipe in her family's home. Following the interview, Plummer was ordered by a superior officer (not Chief Ferreira) to stop seeing Tanner. He was also ordered to move out of her house.

During the summer of 2005, Chief Ferreira heard rumors that, while off-duty, Plummer was frequenting areas in Fall River notorious for drug dealing and prostitution. He also knew that Tanner was a former drug user and that she (then) had open charges of prostitution and larceny.[2]

On October 7, 2005, after an internal investigation, Plummer was charged with multiple violations of the department's Rules and Regulations. Several of the charges related to his association with Tanner.[3] He was also cited for cigarette smoking, itself a potential ground for termination. *See* Mass. Gen. Laws ch. 41, § 101A. Plummer was ordered not to dis-

---

1. Although the identity of the woman is well known in Somerset, for purposes of a published opinion the court will use a pseudonym.

2. In his Response to Defendants' Statement of Material Facts, Plummer states only that he has "insufficient information" to dispute these facts. The court will therefore deem them to be admitted. *See Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d 86, 95 (1st Cir.1996); *Ruiz Rivera v. Riley*, 209 F.3d 24, 28 (1st Cir.2000).

3. The Rules and Regulations provide: "Officers and civilian employees shall avoid regular or continuous associations or dealings with persons whom they know or should know are persons under criminal investigation or indictment, or who have a reputation in the community or the Department for present involvement in criminal behavior...."

cuss the charges with anyone other than his union representative and his attorney.[4]

The Town's Board of Selectmen met on October 20, 2005, to consider the charges. Plummer consented to accept discipline in the form of a written order from Chief Ferreira. The Consent Order stipulated that Plummer would: (1) serve a 20–day suspension; (2) cease all personal contact with Tanner and report all contacts with her; (3) agree to random drug tests for one year; (4) relinquish his position as the department's domestic violence officer; and (5) serve a year's probation. The Order also stipulated that a violation of any of its terms or of the department's rules would constitute grounds for further disciplinary action, including termination. Plummer signed the Consent Order.

On October 28, 2005, Tanner contacted Plummer and told him that she was pregnant. Plummer believed that the child was his. Plummer informed Chief Ferreira of his conversation with Tanner. He requested a modification of the Consent Order so that he could participate in Tanner's prenatal care. Chief Ferreira instructed Plummer to obtain a note from Tanner's doctor verifying the pregnancy. He also told Plummer to submit a written acknowledgment of paternity.[5] Ferreira agreed to present Plummer's request for a modification of the Consent Order to the Board of Selectmen.

Plummer continued to see Tanner, reporting some contacts and not others, including visits with her on December 2 and 3, 2005. These visits were surreptitiously videotaped by the department's internal affairs unit. On December 8, 2005, during an interview, Plummer was less than truthful about his contacts with Tanner, including the visits that had been videotaped. Captain Solomito, who was in charge of the investigation, cited Plummer for insubordination and lack of candor. The charges were then referred to the Board of Selectmen. (Solomito did not cite Plummer for associating with Tanner). On December 15, 2005, Plummer received notice of a disciplinary hearing before the Board of Selectmen scheduled for December 20, 2005. Plummer also learned from his attorney that Chief Ferreira would recommend his termination.

On the day prior to the hearing, Plummer's attorney told him that the Selectmen were disposed to terminate him. He advised Plummer to voluntarily resign in exchange for a promise of future neutral employment recommendations. Plummer submitted a resignation letter and signed a Release of all claims "relating to his employment with and termination from employment with the Somerset Police Department."[6] The disciplinary hearing before the Selectmen was then cancelled.

4. Plummer acknowledges that he disobeyed this order when he explained to Tanner's family why he was moving out of their home.

5. Plummer "disputes" this fact without elaboration. Some two months after Chief Ferreira's request, he produced the doctor's note. Plummer never provided the written acknowledgment of paternity.

6. In his Opposition, Plummer states that "Chief Ferreira personally made explicit threats as to what he would do if Plaintiff did not sign a release. Ferreira stated that he would make it impossible for Plaintiff to ob-

tain a new job, to obtain a loan at any bank in the area, or to support his family." The defendants have moved to strike this and other unsupported "facts" offered by Plummer. The court will strike the statement as Plummer offers no supporting citations to the record. *See Ayala–Gerena,* 95 F.3d at 95 (failure to give record citations supporting the existence of a dispute of fact authorizes the court to accept the opponent's statement of uncontested facts as admitted). *See also Morales v. A.C. Orssleff's EFTF,* 246 F.3d 32, 33–34 (1st Cir.2001) (summary judgment warranted where plaintiff failed to make a single citation to the record).

## DISCUSSION

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Gaskell v. Harvard Co-op. Soc.*, 3 F.3d 495, 497 (1st Cir.1993). "In this context, 'genuine' means that the evidence is such that a reasonable jury could resolve the point in favor of the nonmoving party." *Rodriguez–Pinto v. Tirado–Delgado*, 982 F.2d 34, 38 (1st Cir.1993). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990). If this is accomplished, the burden then "shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the [nonmoving party]." *Id.* The nonmoving party "must adduce specific, provable facts demonstrating that there is a triable issue." *Id.* There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations omitted).

### The Effect of the Release

The Release signed by Plummer states in relevant part:

Officer Plummer acknowledges that by signing this Agreement, he surrenders and gives up any right he has or may have, without limiting the generality of any provision herein, to employment with the Town of Somerset or its Police Department. Officer Plummer further agrees on behalf of himself and his agents, attorneys, representatives, heirs, successors, executors, and assigns to release and forever discharge the Town of Somerset, the Somerset Police Department, and their respective officers, officials, employees, agents, attorneys, and representatives, individually and in their official capacities, from any and all charges, complaints, causes of action, damages, promises, debts, contracts, agreements, back pay, advances, attorneys' fees, financial obligations, and claims of every name and nature, known or unknown, in law or in equity arising or which may have existed up to the date of this Agreement, including but not limited to any and all claims relating to his employment with and termination from employment with the Town of Somerset Police Department.

The Town's Agreement with Plummer bound it as consideration to give a neutral recommendation to any of Plummer's prospective employers.[7] Plummer's only rebuttal to the unambiguous terms of the Release is his insistence that he signed it "under duress."[8] A claim of duress requires a showing that a person was "put in a condition of mind where neither he nor a

---

**7.** The Town's Agreement stated: "If the Department is requested to give a reference for Officer Plummer, the Department will respond by stating his dates of hire only, unless required to do otherwise by applicable state or federal law, rule, or regulation, or by order of a court or administrative body of competent jurisdiction."

**8.** At the hearing on summary judgment, Plummer's (successor) counsel stated that, in

his judgment, Plummer had signed the Release in reliance on erroneous advice from his former attorney and union representative. The Complaint as originally filed accused the former attorney and the union of legal malpractice and violation of the duty of fair representation. These claims were dismissed from the case after Plummer failed to pursue them during discovery.

person of reasonable firmness could have acted otherwise in the circumstances." *Commonwealth v. Robinson*, 382 Mass. 189, 200, 415 N.E.2d 805 (1981). *See also United States v. Castro–Gomez*, 360 F.3d 216, 219 (1st Cir.2004) ("[T]he inquiry hypothesizes a [person] of ordinary firmness and judgment and asks what such a [person] was likely to have experienced or how such a [person] was likely to have acted . . . .").[9]

■ The test of the validity of a waiver has been stated by the Supreme Court as follows: "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (evaluating the validity of a waiver of Fifth Amendment rights). *See also United States v. Olano*, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (waiver is the "intentional relinquishment or abandonment of a known right"). Factors that courts have considered in assessing waivers include a person's mental and emotional state at the time a waiver was made, his maturity, his intelligence, his life experience, the degree to which he understood his rights and alternatives, his access to legal advice and other counsel, and the presence or absence of official coercion.

■ A court looks to the totality of the circumstances in determining the validity of a release and a waiver of rights. *Melanson v. Browning–Ferris Indus., Inc.*, 281 F.3d 272, 276 (1st Cir.2002). Plummer had served as a police officer for five years when he agreed to resign. Because of his training and experience, he was presumably more conversant than the average citizen might be with the legal significance of a waiver of rights. His decision to sign the Release was not impulsive. He was counseled by an attorney and had access to a union representative. He also weighed the countervailing advice of his father, a thirty-year veteran of the State Police. In signing the Agreement, Plummer acknowledged that he understood its terms, that he had discussed it with counsel, and that he knew that he did not have to sign it.[10] Finally, Plummer has failed to produce any evidence of improper official coercion. Consequently, his claim of duress fails as a matter of law.[11]

### THE INDIVIDUAL CLAIMS

The Release is broadly worded and waives all claims against Chief Ferreira in his individual as well as his official capacity arising out of Plummer's termination. To the extent that the Complaint might be read to allege an individual claim against Chief Ferreira that predates, and therefore survives the Release,[12] the court will

9. A legal claim of duress requires the application of external coercion limiting a person's choice. It is to be distinguished from the internal pressure generated by subjective discomfort at having to make difficult choices.

10. The Agreement states: "Mr. Plummer acknowledges and agrees that he has consulted and been advised by counsel of his choice before executing this Agreement. By signing this Agreement, Mr. Plummer represents and warrants that he understands its provisions and does so voluntarily."

11. The unsupported threatening comments attributed by Plummer to Chief Ferreira as evidence of "coercion" have been stricken.

12. The Release covers any claim against Chief Ferreira based on his recommendation to the Board of Selectmen that Plummer be terminated. Nonetheless, it might be suggested (although Plummer does not make the argument) that the language of the Release does not encompass acts undertaken by Chief Ferreira prior to his decision to recommend Plummer's termination, specifically the inclusion in the October 20, 2005 Consent Order of

discuss Plummer's substantive due process claims.[13]

*The Right to Participate in Prenatal Care*

■ Plummer first asserts that he had a "clearly recognized" Fourteenth Amendment right to participate in the prenatal care of Tanner's unborn child.[14] Plummer complains that Chief Ferreira abridged that right when he ordered him to break off his relationship with Tanner. There is a factual difficulty with the argument. The uncontradicted evidence is that Chief Ferreira issued the no-contact order *prior* to any disclosure (by or to Plummer) that Tanner was pregnant. When Plummer informed Chief Ferreira of the pregnancy, Ferreira agreed (on condition that Plummer submit certain written documentation) to present Plummer's request for a modification of the Consent Order to the Board of Selectmen.[15]

■ There is also a legal difficulty with the claim. Qualified immunity attaches to discretionary conduct of government officials that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "The right in question, ... cannot be simply a generalized right, like the right to due process.... It must be clearly established in a 'particularized' sense, so that 'the contours of the right' are clear enough for any reasonable official

in the defendant's position to know that what the official is doing violates that right." *Danese v. Asman*, 875 F.2d 1239, 1242 (6th Cir.1989). Whether a constitutional right asserted by a plaintiff is "clearly established" is a matter of law for the court. *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).

■ As a rule, a right is "clearly established" when it is enunciated by a court of controlling authority in the defendant's jurisdiction in a case sufficiently similar in its facts such "that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). In the absence of such guidance, qualified immunity attaches, and the official is held harmless. *Joyce v. Town of Tewksbury*, 112 F.3d 19, 22 (1st Cir.1997) (*en banc*). "If judges ... disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." *Wilson*, 526 U.S. at 618, 119 S.Ct. 1692.

■ The substantive component of the Due Process Clause incorporates not only the rights and privileges enumerated by the Bill of Rights but also those fundamental rights that are "implicit in the concept of ordered liberty," *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937),—rights that are "deeply rooted in this Nation's history and tradition." [16] *Moore v. City of East Cleveland*,

---

a provision requiring Plummer to cease all personal contact with Tanner.

13. Count III, which asserts an undifferentiated claim under the Massachusetts Civil Rights Act (MCRA) simply parrots the statute without particularizing any secured right derogated by "threats, intimidation or coercion" (as the MCRA requires). The court will assume that the right(s) asserted by Plummer under the MCRA are coterminous with the federal constitutional claims.

14. Because the Constitution creates no "free-floating" right to privacy, a successful privacy claim must be anchored in an enumerated constitutional guarantee. *Vega–Rodriguez v. Puerto Rico Tel. Co.*, 110 F.3d 174, 182 (1st Cir.1997).

15. Plummer produced the requested doctor's letter only on December 14, 2005, after learning that the Board of Selectmen had scheduled a disciplinary hearing.

16. The instant case well illustrates the wisdom of the Supreme Court's decision in *Pear-*

431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977). Cases in which a cognizable liberty interest subject to substantive due process protection has been found for section 1983 purposes typically involve "conscience shocking" invasions by the State of an individual's fundamental right to privacy or personal autonomy. *Albright v. Oliver*, 510 U.S. 266, 272, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) ("The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity."). *See also Bloch v. Ribar*, 156 F.3d 673, 686 (6th Cir.1998) (rape victim's "fundamental right of privacy" was violated by officials' gratuitous public revelation of the intimate details of her rape); *Sterling v. Borough of Minersville*, 232 F.3d 190, 196 (3d Cir.2000) (an official threat to disclose sexual orientation compromises the security of a person's fundamental right to privacy). *Cf. Kallstrom v. City of Columbus*, 136 F.3d 1055, 1062 (6th Cir.1998) (undercover officers' privacy interests in maintaining the confidentiality of personal information contained in their personnel records against disclosure by State authorities "are of constitutional dimension"). Substantive due process claims, however, are narrowly construed. *See Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) ("As a general matter, [we have] always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.").

■ In applying this principle, appellate courts had clearly recognized prior to 2005 a parent's fundamental liberty interest in making decisions that affect the care, custody, and upbringing of her child. *See, e.g., Blixt v. Blixt*, 437 Mass. 649, 655–656, 774 N.E.2d 1052 (2002) (citing *Troxel v. Granville*, 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality opinion)). Plummer, however, cites no case prior to 2005 or since (and the court can find none) that suggests that a prospective father has a fundamental "liberty interest" in "participating" in a mother's prenatal care.[17] In the absence of any such authority, qualified immunity attaches to any alleged claim of interference by Chief Ferreira with Plummer's self-declared substantive due process "right."

*The Right to Intimate Association*

■ Plummer's second assertion is that Chief Ferreira's order violated his

---

son v. Callahan, —— U.S. ——, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), to dispense with the rigid order of battle mandated by *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), that required a court to first explore the issue of whether an official's conduct violated a constitutional right before asking whether the right, if it might exist, was "clearly established." In so doing the Court meant to vindicate two important interests, the interest of the judicial system in avoiding the squandering of scarce judicial resources on largely meaningless inquiries, and the interest of a defendant in resolving an insubstantial claim prior to shouldering the burden of discovery. As Justice Alito concluded for a unanimous Court: "[T]here will be cases in which a court will rather quickly and easily decide that there was no violation of clearly established law before turning to the more difficult question whether the relevant facts make out a constitutional violation at all." *Pearson*, 129 S.Ct. at 820. This is such a case. Had *Pearson* been decided at the inception of this case, Plummer's substantive due process claims would have been ripe for termination on a Rule 12(b)(6) motion to dismiss.

17. The cases that Plummer cites guaranteeing a *woman's* right to choice in matters involving abortion are profoundly inapposite. The same is true of Massachusetts case law holding a child *in vitro* in certain circumstances to be a legal person. These latter cases relate to the *death or injury* of a fetus as a result of grossly negligent or criminal conduct.

substantive due process right to "intimate association." As a preliminary matter, Plummer has some difficulty defining the contours of the right he asserts. *Cf. Poirier v. Massachusetts Dep't of Corr.,* 558 F.3d 92, 95–96 (1st Cir.2009). In his brief, he attempts to distinguish between a protected "committed romantic relationship"—his description of his liaison with Tanner—and an unprotected "casual relationship." The distinction Plummer attempts to draw is borrowed from Judge Gertner's decision in *LaSota v. Town of Topsfield,* 979 F.Supp. 45 (D.Mass.1997). In that case, school authorities learned that a newly hired teacher was involved in a relationship with a man who had been convicted of the rape and abuse of his daughter (although after an appellate reversal and two inconclusive retrials, the charges were dismissed). LaSota's school employer objected to the man's presence on school grounds, and refused to renew her contract. In ruling on a motion to dismiss, Judge Gertner determined that a right to "intimate association" could be found in the First Amendment's guarantee of "freedom of expression" as well as in "the right to privacy established by the Fourteenth Amendment's due process clause." *Id.* at 49. Judge Gertner looked to cases in which the Supreme Court had referred to fundamental rights founded in "the creation and sustenance of family." *Id.* (citing *Roberts v. United States Jaycees,* 468 U.S. 609, 617–618, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984)). Because LaSota lived with the man and had shared with him the raising of her own daughter, had testified on his behalf in his own case, and had repeatedly professed her intention to eventually marry him, Judge Gertner found the relationship to be sufficiently analogous to a formal marriage to be entitled to constitutional protection despite the "absence of a legal bond." *Id.* at 49 n. 12. "While privacy rights may be limited to those which are fundamental or implicit in

the concept of ordered liberty, ... they include the right to associate intimately with a person with whom one contemplates marriage, without fear of government interference." *Id.* at 50 (internal quotations omitted). Nonetheless, as Judge Gertner recognized, the right she had identified had not (at least in 1997) been "clearly established in the First Circuit or any other Circuit." *Id.* at 48. Consequently, the school defendants were granted qualified immunity. That remained the state of the law in 2005. The reason that Plummer cites no "established controlling authority" extending the right of "intimate association" to relationships outside the bounds of marriage (or civil union) is because no such authority exists. The reason is self-evident. It is impossible to draw a principled line demarcating the point on the spectrum of dating relationships at which a romantic attraction is transformed from a dalliance into a prospective union worthy of constitutional protection. As a result, society has defined that line at marriage (or in some states at the declaration of a civil union). As qualified immunity applied to the defendants in *LaSota* in 1997, so it did to Chief Ferreira in 2005 (and would today).

 Even assuming that some generalized constitutional right to "intimate association" did in fact exist in 2005, it is highly unlikely that it would inhere to Plummer in his status as a police officer. A police department is a highly regimented organization that must, in the interests of morale, efficiency, and public safety, place restrictions on the constitutional rights of its rank-and-file that exceed those permitted with regard to civilian employees. *See Oladeinde v. City of Birmingham,* 230 F.3d 1275, 1293 (11th Cir.2000) ("In a law enforcement agency, there is a heightened need for order, loyalty, morale and harmony, which affords a police department more latitude in responding to the speech

of its officers than other government employers."). *See also Guilloty Perez v. Pierluisi,* 339 F.3d 43, 53–54 (1st Cir.2003) (same); *Cronin v. Town of Amesbury,* 895 F.Supp. 375, 384–385 (D.Mass.1995) ("[T]his liberty interest [asserted by Chief Cronin in his private sexual activities and fantasies] is a qualified right which must be balanced against the town's justifiable concerns about the private conduct's impact on Cronin's effectiveness as a police chief, his trustworthiness as custodian of prisoners, and his susceptibility to blackmail.").

The second district court case cited by Plummer is of even less help. In *Shuman v. City of Philadelphia,* 470 F.Supp. 449 (E.D.Pa.1979), a police officer was discharged for refusing to answer questions about his personal life in connection with an official police investigation into an alleged adulterous relationship. The court found that in the absence of any showing that Shuman's private, off-duty sexual behavior had impaired his on-the-job performance, "inquiry into those activities violates the constitutionally protected right of privacy." *Id.* at 459.[18] Applying a balancing test, the court cautioned that while Shuman's private sex life fell "within the protected 'zone of privacy,' this protection is by no means absolute. For example, if the sexual activities of a public employee were open and notorious, or if such activities took place in a small town, the public employer might very well have an interest in investigating such activities and possibly

terminating an employee.... In such a case, the actions of the public employee with respect to his or her private life could be deemed to have a substantial impact upon his or her ability to perform on the job." *Id.* (internal citations omitted).

The third case cited by Plummer, *Wilson v. Taylor,* 733 F.2d 1539 (11th Cir. 1984), is (superficially) closer to the mark. In *Wilson,* a policeman was fired for maintaining a relationship with the daughter of a convicted felon and reputed organized crime figure. The Court found Wilson's discharge unconstitutional, stating that "[w]e conclude that dating is a type of association which must be protected by the first amendment's freedom of association." *Id.* at 1544. There is, of course, a ready distinction between this case and *Wilson.* In *Wilson* there was no allegation that the daughter (unlike her father and Tanner) was personally involved in criminal activity. As the Court noted: "We do not hold that a law enforcement officer may never be fired because of associations with others.... The city did not make the argument that even if dating were protected under the freedom of association provision of the first amendment, a law enforcement officer's rights under that provision could be curtailed due to the nature of police work. We choose not to render an advisory opinion on what conduct would be sufficient for termination of a police officer who associates with certain felons, indicted individuals, suspects, or their relatives." *Id.* at 1544 n. 3.[19]

---

18. The *Shuman* court never explicitly identified the section of the Constitution where it found a "zone of privacy" located, but instead simply cited to passages from *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

19. Unlike in *Wilson,* the Town and Ferreira argue vigorously that their "regulation of Mr. Plummer's public relationship with [Tanner] (which began as soon as they learned of it and before anyone knew she was pregnant), a

known drug user and [alleged] prostitute, related to Mr. Plummer's effectiveness to perform his duties as a police officer and did not violate his rights to privacy and intimate association." They make the telling and obvious point that in addition to compromising his credibility as a witness and casting disrepute on the department, Plummer's association with Tanner created an actual conflict of interest with respect to any criminal matter involving Tanner, and a reasonable public

There is another problem with *Wilson* that Plummer fails to bring to the attention of the court: *Wilson* has been abrogated on the very point for which it is cited by Plummer. *See Chesser v. Sparks*, 248 F.3d 1117, 1125 n. 10 (11th Cir.2001) (because in *Wilson* the Court failed to apply the proper *Pickering* balancing test, "the decision would not have informed a reasonable government actor standing in [defendant's] shoes that he would infringe [plaintiff's] constitutional right of intimate association if he terminated her employment.").[20] *Wilson*, in other words, was no longer good law in 2001, and certainly was not good law in 2005.[21]

### ORDER

For the foregoing reasons, the motion for summary judgment is *ALLOWED* as to all remaining counts. The Clerk will enter judgment for defendants and close the case.

SO ORDERED.

---

perception of potential lapses of judgment in other matters.

20. In dicta, the Court indicated that a right of intimate association might be protected by the Fourteenth Amendment. However, no Eleventh Circuit case has since adopted that view. *Id.* at 1124.

21. *Wilson* is a much criticized case. An example is *Cameron v. Seitz*, 38 F.3d 264, 275 (6th Cir.1994).

Here, the facts, taken in the light most favorable to [plaintiff] Cindy, could support a finding that [defendant] Seitz took adverse employment action against her because of her attendance at the Christmas party hosted by Seitz's "enemies," her romantic involvement with Larry, her engagement to Larry, and her failure to be forthcoming with Seitz as to any of that information. We know of no Supreme Court or Sixth Circuit case clearly extending to any of these bases. *Wilson v. Taylor*, 733 F.2d 1539, 1544 (11th Cir.1984) (dating relationship protected), does support Cindy's position that her association with Larry is protected. However, other circuit court cases strongly suggest that such an association is not a clearly established constitutional right. *See, e.g., Rode* [*v. Dellarciprete*, 845 F.2d 1195, 1205 (3d Cir.1988)] (brother-in-law relationship not protected); *Swank v. Smart*, 898 F.2d 1247, 1252 (7th Cir.1990) (noting that *Wilson*['s First Amendment analysis] does not survive *Roberts*[, *supra*]) (footnotes omitted).