# United States Court of Appeals
## For the First Circuit

No. 12-2038

UNITED STATES OF AMERICA,

Appellee,

v.

JAVIER DIAZ-CASTRO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Gustavo A. Gelpí, U.S. District Judge]

Before

Lynch, Chief Judge,
Howard and Kayatta, Circuit Judges.

María H. Sandoval, Peter Goldberger, and Pamela A. Wilk on brief for appellant.
Juan Carlos Reyes-Ramos, Assistant United States Attorney, Rosa Emilia Rodríquez-Vélez, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, on brief for appellee.

May 23, 2014

**LYNCH, Chief Judge**.  Defendant Javier Diaz-Castro, formerly of the Puerto Rico Police Department (PRPD), was caught committing crimes through a sting operation aimed at corrupt police officers.  Diaz-Castro provided armed protection at what he believed were two drug deals approximately five weeks apart in February and March 2010.  He was found guilty by a jury on multiple counts of conspiracy to possess with intent to distribute a controlled substance, attempt to possess with intent to distribute a controlled substance, and possession of a firearm in relation to a drug trafficking crime.  Following his conviction, Diaz-Castro was sentenced to 40 years' imprisonment.

Diaz-Castro appeals, arguing that various aspects of his conviction and sentence were erroneous.  Like many caught in sting operations, he argues entrapment, along with other issues.  We affirm the convictions and sentence.

I.

Seeking to combat corruption in the PRPD, in 2008, the FBI began a large sting operation, known as "Operation Guard Shack," as has been detailed in other cases arising out of the same operation.  See United States v. Delgado-Marrero, 744 F.3d 167, 171-72 & n.1 (1st Cir. 2014); United States v. Díaz-Maldonado, 727 F.3d 130, 134 (1st Cir. 2013).  The FBI recruited PRPD officers to work for it as confidential informants; those officers then invited suspect PRPD officers to participate for pay by providing armed

-2-

protection for (sham) drug transactions.  See Díaz-Maldonado, 727 F.3d at 134.  The officers who so participated often recruited other officers into the scheme.  See Delgado-Marrero, 744 F.3d at 172-73 & n.5.

In late January or early February 2010, Diaz-Castro was invited by fellow PRPD officer Angel Rivera-Ortiz, known as "Kento," to provide armed protection at a drug deal on February 4, 2010.  Diaz-Castro and Kento were apparently friends.  Kento was a target in the sting operation, as he had been recruited for and had participated in two other Guard Shack deals before this one.

On February 4, Diaz-Castro and Kento arrived at the apartment in Guaynabo, Puerto Rico, where the deal was to take place.  They drank beer and socialized with the purported seller, undercover agent Germán Vázquez.  Diaz-Castro and Kento moved into position when the purported buyer arrived.  They frisked the buyer and took up security positions around the room.  A video of the deal shows that Diaz-Castro carried his regulation firearm during the transaction.  The deal was for eight kilograms of cocaine; during the deal, the buyer counted out six kilograms in front of Diaz-Castro.  After the deal was consummated, as caught on tape, Kento and Diaz-Castro were each paid $2,000.[1]

---

[1]    Diaz-Castro asserts he was paid only $1,000.  The distinction is immaterial to our analysis.

Later (the record does not reveal the precise date), Diaz-Castro was contacted directly by a confidential informant, who invited him to provide protection at another drug deal if he brought along another police officer willing to provide the illicit protection. Diaz-Castro recruited Ramón Benítez-Falcon, a friend and fellow PRPD officer. Diaz-Castro also told Benítez-Falcon to bring a handgun with him, as the PRPD had taken Diaz-Castro's police-issued weapon on March 4, 2010, because a domestic violence complaint had been filed against him.

This second transaction took place at the Conrad Hotel in San Juan, Puerto Rico on March 12, 2010. Like the first transaction, Diaz-Castro spent time drinking and socializing with the other participants in the deal, then moved into position when the buyer arrived. At the request of the undercover officer, Vázquez, Diaz-Castro handed him a bag purportedly containing nine kilograms of cocaine, which Vázquez passed along to the buyer; the buyer pulled out and inspected five kilograms. The deal successfully concluded. Diaz-Castro and Benítez-Falcon were each paid $2,000. After getting paid, Diaz-Castro stayed in the room with the purported seller and others, drinking beer and socializing.

On September 16, 2010, a federal grand jury indicted Diaz-Castro on six counts. The charges came within a broader indictment reaching other officers who had been caught in the same

set of sham drug transactions, including Kento and Benítez-Falcon.[2] The counts relevant to Diaz-Castro were:

Count 8: Conspiracy to possess with intent to distribute a controlled substance, from January 27 to February 4, 2010, under 21 U.S.C. §§ 841(a)(1) and 846.

Count 9: Attempt to possess with intent to distribute a controlled substance on February 4, 2010, under 21 U.S.C. §§ 841(a)(1) and 846.

Count 10: Possession of a firearm in relation to a drug trafficking crime, on February 4, 2010, under 18 U.S.C. § 924(c).

Count 14: Conspiracy to possess with intent to distribute a controlled substance, from February 16, 2010 to March 12, 2010, under 21 U.S.C. §§ 841(a)(1) and 846.

Count 15: Attempt to possess with intent to distribute a controlled substance, on March 12, 2010, under 21 U.S.C. §§ 841(a)(1) and 846.

Count 16: Aiding and abetting possession of a firearm in relation to a drug trafficking crime, on March 12, 2010, under 18 U.S.C. § 924(c).

Diaz-Castro went to trial and was convicted by a jury on all six counts in December 2011. The jury also made special findings that the February 4 drug deal (Counts 8-9) involved eight kilograms of fake cocaine, while the March 12 drug deal (Counts 14-15) involved nine kilograms.

The district court sentenced Diaz-Castro in July 2012. Diaz-Castro received the mandatory minimum sentence on all counts:

---

[2] Benítez-Falcon ultimately pled guilty and became a cooperating witness for the government, testifying against Diaz-Castro.

10 years for each of the drug trafficking and conspiracy counts (Counts 8, 9, 14, and 15), 5 years for the first firearms count (Count 10), and 25 years for the second firearms count (Count 16). See 21 U.S.C. § 841(b)(1)(A) (drug trafficking crimes); 18 U.S.C. § 924(c)(1)(A)(i) (firearms in drug offense); 18 U.S.C. § 924(c)(1)(C)(i) (second conviction for firearms in drug offense). The 10-year drug trafficking sentences were to run concurrently, after which the 5-year and 25-year firearms sentences were to be served consecutively. That sentence totals to 40 years' imprisonment. Diaz-Castro timely appealed.

## II.

Diaz-Castro presents a variety of challenges to his conviction and sentence. Specifically, he argues: (1) that the evidence was insufficient to sustain his conviction; (2) that the district court erroneously denied him the opportunity to present entrapment, derivative entrapment, or duress defenses; (3) that the prosecutor's statements at closing argument improperly shifted the burden onto the defendant and improperly vouched for witnesses; and (4) that the two conspiracies were in fact a single one and so Diaz-Castro should have been convicted and sentenced on only a single count of conspiracy, and on only one count of possession of

firearms in relation to a drug trafficking crime.  We address each of these arguments in turn.[3]

A.        Sufficiency of the Evidence

At multiple points during his trial, Diaz-Castro filed motions for acquittal, claiming that the government's evidence was insufficient to support a conviction.  See Fed. R. Crim. P. 29. The district court denied each, and Diaz-Castro now argues that those denials constitute reversible error.

We review the denial of a motion for acquittal de novo. See United States v. Willson, 708 F.3d 47, 52 (1st Cir. 2013). Denial of a motion for acquittal is proper if, "taking the evidence at trial in the light most favorable to the jury's verdict, a rational factfinder could find that the government proved each essential element of the crime beyond a reasonable doubt."  United States v. Soto, 720 F.3d 51, 55 (1st Cir. 2013).  In this case, the evidence presented at trial was more than sufficient to support the jury's verdict.

_____

[3] Before reaching Diaz-Castro's principal arguments, we note what is not at issue in this case.  In the district court, Diaz-Castro argued that his conviction as to Count 16 should be reversed due to lack of sufficient notice in the indictment, and that his entire sentence should be vacated due to sentencing factor manipulation.  The district court rejected both arguments.  In his opening brief, Diaz-Castro did not argue that the district court's decisions were erroneous, much less why they were.  Thus, those arguments are waived.  See, e.g., United States v. Miliano, 480 F.3d 605, 608 (1st Cir. 2007); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

As to Count 8 (the first conspiracy count), the evidence at trial showed that Diaz-Castro agreed with Kento to provide armed protection at a drug deal. A video recording of the transaction, introduced at trial, shows Diaz-Castro arriving, socializing, then frisking the buyer for weapons, and accepting payment for his services, all overt acts in furtherance of the conspiracy. As to Count 9 (attempted drug trafficking with respect to the first transaction), the video also showed the purported buyer counting six kilograms of a substance he claimed was cocaine in Diaz-Castro's presence, then consummating the transaction. And as to Count 10 (possession of a firearm in relation to a drug trafficking crime), the video further shows that Diaz-Castro brought his firearm and had it with him during the transaction.

The evidence equally supports the jury's verdict with respect to the second transaction. As to Count 14 (the second conspiracy count), Benítez-Falcon, the officer Diaz-Castro recruited, testified that he had agreed with Diaz-Castro to provide armed protection for the drug deal. The video of the transaction, introduced at trial, shows that Diaz-Castro actually played a part in the drug deal, including handing the bag containing the fake drugs to the seller. As to Count 15 (attempted drug trafficking with respect to the first transaction), the video also shows the seller counting out quantities of the fake drugs and transferring the fake drugs to the buyer. And as to Count 16 (aiding and

abetting possession of a firearm in relation to a drug trafficking crime), Benítez-Falcon testified that Diaz-Castro had instructed him to bring a firearm to the deal, and that he actually did so, in furtherance of the goal of providing security for the drug deal.

This evidence -- much of it objective video evidence -- is, when taken in the light most favorable to the government, more than sufficient for a jury to conclude beyond a reasonable doubt that the government proved its case on all counts. That disposes of the sufficiency claim.

Diaz-Castro makes two more limited arguments. First, he argues that the evidence was insufficient to show that he participated voluntarily, and that the jury should have heard evidence of and been instructed on an entrapment or duress theory. This argument turns on the validity of those defenses, and we address it in that context below. Second, he argues that the fact that he was unarmed at the second transaction precludes a guilty verdict on the second firearms count. This argument neglects the fact that the count charged "aiding and abetting" the firearms crime, not direct possession of the firearm. Since the evidence showed that Diaz-Castro recruited Benítez-Falcon and instructed him to bring a firearm, it was sufficient to sustain the conviction.[4]

---

[4] The Supreme Court recently addressed the topic of aider and abettor liability in <u>Rosemond</u> v. <u>United States</u>, 134 S. Ct. 1240 (2014). There, the Court clarified that "[a] defendant can be convicted as an aider and abettor without proof that he participated in each and every element of the offense," <u>id.</u> at 1246

B.        <u>Entrapment, Derivative Entrapment, and Duress Defenses</u>

Before the trial, the government filed a motion in limine to prohibit Diaz-Castro from entering certain evidence for the purpose of supporting entrapment, derivative entrapment, or duress defenses, arguing that none of the defenses were viable.[5] In response, Diaz-Castro pointed to the following: (1) phone calls between the government's agents and Kento pressuring Kento to recruit more officers; (2) acting by the purported seller, Vázquez, at the time of the first drug deal that may have made Diaz-Castro afraid to withdraw, such as comments implying that Vázquez was armed, had used drugs that day, was suspicious that Diaz-Castro was an undercover agent, and would shoot any law enforcement agents who arrived; (3) Diaz-Castro's profuse sweating at the first deal;[6] and (4) similar acting by Vázquez at the time of the second deal, although this time apparently mostly targeted at Benítez-Falcon.

---

(alteration in original) (quoting <u>United States</u> v. <u>Sigalow</u>, 812 F.2d 783, 785 (2d Cir. 1987)) (internal quotation marks omitted), so long as he also has "advance knowledge" of the other elements, <u>id.</u> at 1249. Diaz-Castro clearly had advance knowledge that Benítez-Falcon would have a firearm, since he instructed Benítez-Falcon to bring it.

[5]   Most of the evidence excluded consisted of a set of audiotaped conversations between confidential informants and Kento organizing the first drug deal, with two additional audiotaped conversations between a confidential informant and Diaz-Castro organizing the second drug deal.

[6]   In response to this piece of evidence, the government points out that the room in which the purported drug deal occurred was approximately 90 degrees Fahrenheit at the time, as the air conditioner was not turned on until shortly before the deal.

The district court granted the government's motion, concluding that this evidence did not establish the elements of any of the various defenses. It subsequently denied Diaz-Castro's request for a jury instruction on these defenses. Diaz-Castro argues that these decisions were erroneous.

We review the evidentiary challenge for abuse of discretion and review the refusal to give a jury instruction de novo. See United States v. Brown, 669 F.3d 10, 22 (1st Cir. 2012); United States v. Dávila-Nieves, 670 F.3d 1, 9 (1st Cir. 2012). There was no error in either of the rulings.

1.    Duress

Duress is an affirmative defense requiring proof that the defendant committed a crime as a result of (1) an immediate threat of serious bodily injury or death (2) that the defendant reasonably believed was true, (3) without a reasonable opportunity to escape or frustrate the threat. See United States v. Arthurs, 73 F.3d 444, 448 (1st Cir. 1996). Diaz-Castro argues that he was coerced into the drug transactions to the point of duress, and would not otherwise have engaged in these crimes.

Not so. Diaz-Castro voluntarily came to the two locations to participate in the drug deals. There is no evidence that he was threatened before making the initial choice to participate. He voluntarily chose to return for the second transaction, making implausible his argument that he was so

-11-

seriously threatened at the first as to have participated against his will. There was no evidence in the record of an immediate threat of injury or death that forced him to participate.

Diaz-Castro shifts his argument to what was said at the transactions, arguing that Vázquez made intimidating statements at the events, which coerced him into staying and participating when he otherwise would have withdrawn. There was no record evidence of any effort to withdraw. To the contrary, the video shows Diaz-Castro was enjoying himself. Further, a defendant cannot claim a duress defense if he "recklessly placed himself in a situation in which it was probable that he would be subjected to duress." United States v. Castro-Gómez, 360 F.3d 216, 219 (1st Cir. 2004) (quoting 1 LaFave & Scott, Substantive Criminal Law § 5.3, at 622 (West 1996 & 2003 Supp.)) (internal quotation mark omitted). The duress defense was not even colorable.

2. Entrapment

An entrapment defense requires proof that (1) the government applied an improper degree of pressure or used other improper tactics to induce the crime and (2) the defendant was not already predisposed to commit the crime. United States v. Santiago, 566 F.3d 65, 68 (1st Cir. 2009). Diaz-Castro does not point to any evidence showing that he would not have committed these crimes but for improper pressure by the government. In fact, he does not even claim that the government pressured him at all.

He joined the first conspiracy when asked by Kento without any improper pressure, and he freely and voluntarily returned for a second transaction.

### 3. Derivative Entrapment

Diaz-Castro also argues that he was entitled to put on a derivative entrapment defense. The derivative entrapment doctrine allows criminal defendants to assert they were entrapped when "a government agent 'uses [an] unsuspecting middleman as a means of passing on an inducement' to the defendant." United States v. Luisi, 482 F.3d 43, 53 (1st Cir. 2007) (quoting 2 W. LaFave, Substantive Criminal Law, § 9.8(a), at 93 (2d ed. 2003)). We have dealt with the derivative entrapment defense at length in two cases: Luisi, 482 F.3d at 43, and United States v. Bradley, 820 F.2d 3 (1st Cir. 1987).

In Bradley, a prison inmate was offered a reduced sentence in exchange for providing a drug dealer to the police. The inmate, acting as an agent of the police, approached co-defendant James Brenner, whom he asked to provide a pound of cocaine. See Bradley, 820 F.2d at 5-6. The inmate repeatedly threatened Brenner with physical violence. Brenner, in turn, reached out to defendant John Bradley for help. Bradley resisted at first but ultimately agreed to help procure cocaine out of concern for Brenner's physical safety. At trial, the jury acquitted Brenner, presumably on his entrapment or duress defense,

but convicted Bradley.  See id.  On appeal, we affirmed Bradley's conviction, finding no viable entrapment defense.  We cited a number of factual and policy considerations, namely: the fact that the inmate had neither instructed nor expected Brenner to apply improper pressure against a third party; the absence of direct pressure on Bradley; the increased difficulties of proof when the government is a stranger to the transaction; the difficulty of investigating "victimless" drug crimes; and the relative social importance of fighting this type of crime weighed against the "offensive[ness]" of the government action.  Id. at 6-9.

In Luisi, by contrast, the government's pressure was much more direct.  For several months, an undercover FBI agent attempted to conclude a cocaine deal with La Cosa Nostra member Robert Luisi.  Eventually, the FBI had an informant in the organization tell the organization's boss (and Luisi's superior) that Luisi had an opportunity to make a profitable deal but was failing to execute on it.  Following this manipulation from the informant (although the boss did not know of the FBI connection at the time), the boss directly ordered Luisi to complete the transaction, and he complied within two days.  See Luisi, 482 F.3d at 45-48.  At trial, the district court declined to give a jury instruction stating that the boss's order to Luisi could be attributed to the government.  See id. at 54.  Luisi was convicted by a jury.  On appeal, this

court vacated the conviction.  Id. at 45.  We identified five features in our case law defining the entrapment defense:

> (1) a government agent specifically targeted the defendant in order to induce him to commit illegal conduct; (2) the agent acted through the middleman after other government attempts at inducing the defendant had failed; (3) the government agent requested, encouraged, or instructed the middleman to employ a specified inducement, which could be found improper, against the targeted defendant; (4) the agent's actions led the middleman to do what the government sought, even if the government did not use improper means to influence the middleman; and (5) as a result of the middleman's inducement, the targeted defendant in fact engaged in the illegal conduct.

Id. at 55.

Both Luisi and Bradley contemplate that, to establish a derivative defense, the government must actually pressure the defendant to commit a crime, even if it applies that pressure through the medium of a government-instructed middleman.  See Luisi, 482 F.3d at 56, 58 (concluding that derivative entrapment instruction is proper where a jury can find that the government "was responsible" for the pressure brought to bear on the defendant); Bradley, 820 F.2d at 8 (requiring a defendant seeking to present a derivative entrapment defense to show, "at least," that "pressure had been put upon him by the intermediary at the instruction of the government agent").  Thus, in Luisi, the derivative entrapment defense was viable where a government agent targeted the defendant by having his superior, a criminal gang

lord, instruct him to commit a crime, while in <u>Bradley</u>, the defense was not viable because there was no evidence that the government had sought to pressure the defendant at all.

Diaz-Castro cannot show that the government was responsible for pressuring him to commit a crime, since he has not shown that he was pressured at all.  To be sure, the government agents asked Kento to recruit another officer into the scheme; but they did not ask Kento to target Diaz-Castro, nor did they ask him or reasonably expect him to apply pressure of any sort in recruiting a confederate.  Without any evidence of improper pressure exerted upon him by Kento, Diaz-Castro cannot make out a derivative entrapment claim.

Because none of the asserted defenses were viable, the motion in limine was properly granted and the request for a jury instruction was properly denied.

C.     <u>Government's Comments at Closing Argument</u>

Diaz-Castro next argues that the prosecution's comments during closing argument were improper for two reasons: first, because they improperly shifted the burden of proof onto the defense, and second, because they highlighted the risk of danger associated with the undercover agent's job.  We analyze de novo whether the comments were improper.  <u>United States</u> v. <u>Glover</u>, 558 F.3d 71, 76 (1st Cir. 2009).  If we conclude that they were

-16-

improper, we then review for harmless error, because Diaz-Castro preserved his objections.  See id.

1.      Burden of Proof Comments

The following exchange took place during the closing argument by Diaz-Castro's attorney, Ms. Sandoval:

> [MS.    SANDOVAL:]    What    informant,    what undercover agent contacted Javier Diaz-Castro and urged him to bring another police officer, to make sure that he had a weapon?  You know the answer to that question.  And there were informants   in   those   DVDs.    There   were informants in those DVDs. . . .
> Why weren't those informants brought into this courtroom so you could look at them in the eyes, look at them sitting in that chair,   and   let   me   interrogate   and cross-examine them?
> MR.   GIBSON:    Objection.    She   could   have brought any one of them in here any time she wanted to.
> MS. SANDOVAL:  Objection, Your Honor.  This is highly irregular.
> THE COURT:  Continue, Counsel.
> MS. SANDOVAL:  Highly irregular.
> In whose control were these informants? In response to what my colleague just said, I'm going to ask you -- I'm going to ask you to   remember   what   the   Honorable   Judge   Gelpi said.  My client is presumed innocent.  He doesn't have to put on one shred of evidence. I could have painted my nails throughout this trial  and  done  nothing,  and  the  Government would  still  have  the  burden  of  proving  my client beyond a reasonable doubt.
> The  ones  who  had  the  duty  to  bring those informants and put them on the stand --
> MR. GIBSON:  Objection, Objection.
> THE COURT:  Counsel, approach.
> MS.  SANDOVAL:   I'll withdraw.   I'll move on.
> MR. GIBSON:  No, Your Honor.  I think we need to approach.

Diaz-Castro points to the comment made during the first objection -- "[s]he could have brought any one of them in here any time she wanted to" -- and argues that this comment improperly shifted the burden of proof onto the defendant. In response, the government argues that the comments were not improper because they responded to the discussion by Diaz-Castro's attorney of the government's decision not to present certain witnesses.

In fact, the court had previously instructed the parties that it would not allow an argument about missing witnesses. Sandoval violated that instruction first. At a sidebar following the above exchange, the court explained:

> Ms. Sandoval, the mention that the Government had to put informants on the stand or bring them, that goes against the instructions I gave. I know you had submitted that instruction that I give. Now, I have to give the jury a curative instruction because they did not have to bring those informants. They can choose who their witnesses are going to be.

After hearing from the parties, the court ultimately gave two curative instructions to the jury, stating:

> Okay. Before the Government presents a rebuttal, let me inform the members of the jury the Government is entitled to present a short rebuttal argument in a criminal case and that is because the Government carries the heavy burden of proving the case beyond a reasonable doubt.
> So before we hear from the prosecutor, let me explain something. When Ms. Sandoval did her closing, she mentioned that the Government did not bring some particular witnesses to testify. The Government is not

required by the law or the constitution to present every witness that may be available. The witnesses and the evidence that you will consider is only the evidence that was presented here in court.

On the same token, the defendant, Mr. Diaz-Castro, does not have to bring any evidence nor present any witnesses. So you only decide the case based on the evidence that was presented here in court and not what was not presented. You only consider what was presented here in court.

So having said that, Mr. Gibson, if you want to present a short rebuttal argument, please go ahead.

Contrary to the government's contention, its comments were improper: made in the context of a speaking objection before the jury and entailing an incomplete statement of the law, they suggested to the jury that the defense had to call any witnesses it felt were missing. See United States v. Roberts, 119 F.3d 1006, 1015 (1st Cir. 1997) (vacating conviction for plain error where, in part, prosecutor had said to jury, "the defendant has the same responsibility [as the government] and that is to present a compelling case"). Nonetheless, we are satisfied that the error is harmless beyond a reasonable doubt. Unlike the situation in Roberts, the district court here considered both the prosecution's error and the defense's error that had prompted the objection and gave instructions that directly addressed both. The jury was explicitly reminded that the burden -- a "heavy" one -- belongs solely to the government, and that the defense's decision not to call witnesses was irrelevant. Diaz-Castro does not argue that he

was still prejudiced despite that instruction. In the context of this trial, it is evident that the instruction was enough to render harmless any defect that the prosecution's comments caused. Cf. United States v. Ferrera, 746 F.2d 908, 910-11 (1st Cir. 1984) (discussing factors relevant to harmlessness, including contemporaneous curative instruction).

### 2. Comments on Risk to Undercover Agent

Diaz-Castro also argues that the prosecution's comments regarding the risks that the undercover agent (Germán Vázquez) faced were improper. Specifically, the prosecutor explained in closing argument that Vázquez had received threats against his family and ultimately had to move to Florida as a result of his undercover work on Operation Guard Shack. Diaz-Castro argues that this comment was improper under United States v. Ayala-García, 574 F.3d 5, 17-22 (1st Cir. 2009), which, he says, prohibits a prosecutor from bolstering a witness's testimony or credibility by pointing to the public service the witness has performed or the danger he faced.[7]

In context, the prosecutor's comments were not improper. The prosecutor was not suggesting that the mere fact that Vázquez's work was dangerous made his testimony important, or that Diaz-Castro was too dangerous to acquit. Instead, the prosecutor

---

[7] Diaz-Castro does not argue that the statements about the risks Vázquez faced were unsupported by the record -- in fact, he admits that they were based on Vázquez's trial testimony.

-20-

mentioned the threats against Vázquez's family and his need to relocate to Florida in direct response to Diaz-Castro's argument, as he frames it on appeal, that Vázquez "was a manipulative and greedy man who had handled the FBI much better than they had handled him."  Diaz-Castro had tried to discredit Vázquez's testimony by showing that he had used his role as an FBI informant for significant personal gain; the government then rebutted that argument by showing the risks and losses that Vázquez faced as a result of his work in the operation.  That is a valid response, based on trial evidence, to the defense's attempt to damage the witness's credibility.  See United States v. Gentles, 619 F.3d 75, 84-85 (1st Cir. 2010).  As such, those comments were not improper.

D.      Multiplicity Challenges

Diaz-Castro argues he should have been convicted and sentenced for only one conspiracy because both drug transactions were part of a single, larger conspiracy.  He argues that the conspiracy counts, Counts 8 and 14, were artificially divided by the government.  He further argues that because there was only one conspiracy, there can be only one firearms charge, so the 25-year mandatory minimum on the second firearms charge cannot apply.[8] These two claims were preserved and thus are subject to de novo

_____

[8]      The firearms provision under which Diaz-Castro was convicted and sentenced for Counts 10 and 16, 18 U.S.C. § 924(c), provides a mandatory minimum sentence of 5 years for a first offense and 25 years for a second or subsequent offense.

-21-

review.  See United States v. Gerhard, 615 F.3d 7, 18 (1st Cir. 2010).

### 1.    Division of Conspiracy

Diaz-Castro argues that whether there was one conspiracy or two is a jury question and that he was entitled to an instruction on that topic.

The district court did not err because it is clear that no reasonable jury could find that only a single conspiracy existed.  The actors in the two conspiracies were completely different, with Diaz-Castro as the only overlapping member, and no activity took place for more than a month after the first drug deal.  See United States v. Castellini, 392 F.3d 35, 52 & n.11 (1st Cir. 2004) (explaining that government agents cannot be members of a conspiracy).  Diaz-Castro was invited to the second drug deal by an unnamed confidential informant with whom he had apparently had no prior direct contact.  He then recruited Benítez-Falcon, who had not previously been involved in any Operation Guard Shack deals.  In fact, the agreement with Benítez-Falcon is what triggered the second conspiracy charge.  The evidence does not show in any way that the second drug deal was related to the first aside from the fact that both were sting deals in Operation Guard Shack and involved the same undercover agent.

2. <u>Multiple Firearms Charges</u>

Diaz-Castro argues that his convictions and sentences for the firearms charges were improperly multiplicitous.  That argument fails.

The statute under which Diaz-Castro was charged, 18 U.S.C. § 924(c), explicitly states that it applies with respect to each "crime of violence or drug trafficking crime."  Here, Diaz-Castro engaged in two separate drug trafficking crimes, as charged in Counts 9 and 15.  These offenses were distinct: they were separate deals, more than a month apart, involving different people, and at different locations.  Diaz-Castro was properly convicted and sentenced on two separate counts under § 924(c) when he violated that provision on two separate occasions.[9]

<u>United States</u> v. <u>Peña-Lora</u>, 225 F.3d 17 (1st Cir. 2000), is not to the contrary.  In <u>Peña-Lora</u>, we held that a set of consecutive sentences imposed under § 924(c) must instead run concurrently where a single crime of violence (an incident of

_____

[9] Diaz-Castro also attempts to reframe his multiplicity argument as an argument under <u>Alleyne</u> v. <u>United States</u>, 133 S. Ct. 2151 (2013).  He argues that, in order to sentence him to a 25-year mandatory minimum sentence for his second conviction under § 924(c), the district court needed to refer the question of whether the conviction on Count 16 was a second or subsequent conviction to the jury for a finding beyond a reasonable doubt.  This argument is frivolous.  The jury found guilt beyond a reasonable doubt on two separate § 924(c) charges.  Even if that verdict itself were not enough to show that the conviction on Count 16 was a second or subsequent conviction, <u>Alleyne</u> explicitly does not require jury findings for the fact of a prior conviction.  <u>See</u> <u>id.</u> at 2160 n.1.

hostage-taking) involved the use of multiple firearms and the defendant was charged separately for each weapon. Id. at 32. The facts are readily distinguishable from this case, in which two completely distinct drug trafficking crimes involved the possession of firearms and the defendant was charged separately based on each underlying drug crime.[10]

                                III.

        For the reasons stated above, we affirm.

---

    [10] Diaz-Castro further argues that his firearms sentences should be set to run concurrently like those in Peña-Lora. This argument fails, however, for the same reasons described above; Peña-Lora does not control here.
    Diaz-Castro also makes a related argument regarding his sentencing, that the district court should have granted certain downward variances that it chose not to. This argument is not clearly developed and so is waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Even if the argument were not waived, Diaz-Castro does not show how the variances he sought would have helped him avoid the mandatory minimums to which he was ultimately sentenced, nor does he identify any factors showing that the district court abused its discretion. That is insufficient to reverse what Diaz-Castro admits were the district court's "thoughtful[]" considerations at sentencing.