# United States Court of Appeals
## For the First Circuit

No. 23-1035

UNITED STATES OF AMERICA,

Appellee,

v.

DANYBELKIS VASQUEZ-RODRIGUE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Kayatta, Lynch, and Gelpí,
Circuit Judges.

Theodore M. Lothstein, with whom Lothstein Guerriero, PLLC was on brief, for appellant.
Donald C. Lockhart, Assistant United States Attorney, with whom Joshua S. Levy, Acting United States Attorney, was on brief, for appellee.

March 15, 2024

**LYNCH**, **Circuit Judge**.  Danybelkis Vasquez-Rodrigue appeals her jury conviction of conspiracy to distribute and possess 400 grams or more of fentanyl in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vi), 846.  She argues that the district court, applying this Court's test, erred in two ways in denying her requested jury instruction by ruling that the evidence did not warrant a duress instruction because she had intentionally or recklessly placed herself in a situation where it would be probable that she would be subject to duress and because she had had a reasonable opportunity to escape or otherwise frustrate the threat.  On plain error review, she independently argues that the legal standard for duress agreed to at trial by all parties does not apply to cases involving only conspiracy crimes.

The district court applied the correct legal standard and did not err in denying the instruction.  We affirm.

## I.

## A.

In November 2020, agents with the Federal Bureau of Investigation ("FBI") Boston Organized Crime Drug Enforcement Task Force began investigating Saury Rodriguez-Ruiz ("Saury"), Vasquez-Rodrigue's former boyfriend and a co-defendant, based on information from a cooperating informant ("CI") that Saury was selling drugs in Lawrence, Massachusetts.  The investigation produced evidence, presented at a six-day trial, including

surveillance recordings, phone call recordings, cell phone and WhatsApp messaging evidence, and the testimony of the cooperating witness ("CW"), a CI working with the task force. Sergeant Bryan Marks of the Norfolk County Sheriff's office and FBI Special Agent Albert Fonseca, case agents who participated in the investigation, also testified. In addition, as described below, Vasquez-Rodrigue testified and made a number of admissions.

On November 17, 2020, an unnamed CI working with Sgt. Marks set up the purchase of a kilogram of fentanyl from Saury for a future payment from the CW of $42,000, to be paid within one month. On November 24, 2020, Saury delivered 991 grams of fentanyl to the CW near 4 Winthrop Avenue in Lawrence. On December 3, 2020, before the CW paid for the fentanyl, Saury was arrested and jailed on charges unrelated to the case.

On December 7, 2020, a Mexico-based fentanyl supplier known as Riky[1] contacted the unnamed CI to discuss when and to whom the payment for the kilogram of fentanyl would be made. Riky then turned to Vasquez-Rodrigue, the former girlfriend of the jailed Saury.

Between December 9 and 15, 2020, Riky and Vasquez-Rodrigue exchanged WhatsApp messages and phone calls evidencing

---

[1] Riky is also known by and referred to in the record by other names, including "Teka," "El Mayor," "the man down there," "the man from Mexico," and "the guy from down there."

that each expected Vasquez-Rodrigue to be the contact for the CW to make payment for the fentanyl. In messages exchanged on December 14 and 15, 2020, Riky and Vasquez-Rodrigue discussed the terms of the November 24 fentanyl sale to the CW and that the first expected partial payment would be $20,000. On December 15, 2020, Riky called the CW stating Riky was the owner of the fentanyl that the CW had purchased from Saury. Riky told the CW that he was in Mexico and that the CW should pay Vasquez-Rodrigue for the fentanyl. Later that same day, Vasquez-Rodrigue and the CW spoke on the phone about how he would pay her in Lawrence the next day. During the call, Vasquez-Rodrigue referred to the CW's purchase from Saury, telling the CW, "[y]ou came down here once to where my husband was." The CW was also contacted on December 15, 2020, by Roladi[2], another person who collected drug debt payments for Riky, seeking to collect payment for the fentanyl from him.

On December 16, 2020, the next morning, Vasquez-Rodrigue called Saury at the jail. Saury told Vasquez-Rodrigue that the CW owed $42,000 for one kilogram of fentanyl. He laid out for her the division of revenue from this sale between the drug supplier in Mexico ($33,000); the drug transporter ($1,000); and additional profit to be divided between Riky and Saury ($8,000). They also discussed accounting for the drug transactions in a ledger.

_____

[2] Roladi is also known by and referred to in the record by other names, including "Riladi."

Right after making this phone call on December 16, 2020, Vasquez-Rodrigue called the CW and said that they should meet around 10:00 a.m. near where the original drug exchange had occurred. A few minutes later, the CW called Riky stating he was confused about whether to give the money to Vasquez-Rodrigue or to Roladi, who had also contacted him regarding payment. Riky confirmed that the CW should deliver the money to Vasquez-Rodrigue. But Vasquez-Rodrigue did not answer her phone when the CW called, nor did she arrive in the area at the agreed-upon time. The CW then called Riky, who instructed him to deliver the money to Roladi instead. The CW gave Roladi the first partial payment of $10,000.

Immediately after the CW paid Roladi on the morning of December 16, 2020, he received a call from Vasquez-Rodrigue, who was upset that the money had not been given to her. She stated:

> That was the first time and the last time you are going to deliver to that guy. . . . [I]f [there is] anything [you need], you call me at this number. . . . I am going to communicate with . . . whom you delivered to now, for him . . . to give me that money. Then, when you have [to] deliver something again, whatever it is, you give me a call on this phone. . . . [This is] a business that you have to be very careful about, you can't be involving so many people in this. . . . <u>My husband left me in charge of that because I more or less understand the [drug] business, I understand how everything moves, because I've been in this for a couple of years, you know what I mean?</u>

- 5 -

(Emphasis added).  Both Vasquez-Rodrigue and Riky then told the CW to make payments only to Vasquez-Rodrigue going forward.

Mid-morning on December 16, 2020, right after this call, Vasquez-Rodrigue met with Roladi to get from him the $10,000 cash payment.  Later that morning, she called Saury in jail and told him that the CW had paid $10,000 of his drug debt to someone else, but that she had collected the money from that person.  She also told Saury the details of her conversation with the CW, including that he was to pay only her going forward.  During this December 16, 2020, conversation, upon Saury's instruction, Vasquez-Rodrigue initiated a three-way call among her, Saury, and another man, possibly Riky, during which Saury stated that he had left Vasquez-Rodrigue in charge while he was incarcerated. Vasquez-Rodrigue then sent Riky a photo of the $10,000 in cash she had collected.

After collecting this initial payment, Vasquez-Rodrigue began on December 16, 2020, to send money to a list of people, provided by Riky, in Mexico and the Dominican Republic via a money transfer business in Lawrence through a series of transactions ranging between several hundred and one thousand dollars each. She sent over $20,000 in thirty-five transactions between December 16 and 28, 2020, thirty of which took place before December 23, 2020.  She also sent photos to Riky of each money remitter receipt detailing the transactions.  For every $1,000 she

sent, she received $50. Special Agent Fonseca testified that such actions are the standard practice for drug dealers in Massachusetts to transfer to Mexico the proceeds earned from selling fentanyl.

On December 19, 2020, Vasquez-Rodrigue called the CW and told him that she would serve as the intermediary between him and Riky for all future drug orders and payments, stating, "he is going to communicate with you through me." The CW asked her to provide him with more drugs, and she responded that, per Riky's instructions, he needed to pay more of the remaining balance for the November 24 fentanyl transaction -- "at least 20 or 25" thousand dollars of that debt -- or she and Riky would not provide the CW with more fentanyl. She told him that once the CW paid, she would send the money to Riky, and he would send it to his drug suppliers, after which they could provide more drugs.

On December 23, 2020, Vasquez-Rodrigue called the CW once again to arrange for him to pay the balance of his drug debt, stating, "the guy from down there called me," and that she was "the one responsible" for ensuring the debt was repaid. After further discussions among the CW, Riky, and Vasquez-Rodrigue, on December 30, Vasquez-Rodrigue told the CW to meet her at the same place to pay the remaining balance. When Vasquez-Rodrigue and the CW met at 4 Winthrop Avenue, Vasquez-Rodrigue opened the door of Apartment 4D with a key and led the CW into the apartment, where she counted the $32,000 he gave her. The CW testified at trial

that she counted the money "[l]ike she knows what she's doing, fast and even" and "[t]he way she's doing it, she does that for a living." As Vasquez-Rodrigue counted, she told the CW that because Saury was in prison, she was "the one who had to take care of all of this," meaning the drug business. She also told the CW, "I am going to talk with the guy," and asked the CW what he needed. When he responded, "I need something," meaning fentanyl, she said, "[o]kay, I'm going to talk with him, I'm going to tell him that you need . . . something to see if he can send it to you." After this transaction, Vasquez-Rodrigue left the apartment with the $32,000 in cash and went to a money remitting business.

On December 31, 2020, Vasquez-Rodrigue called Saury and told him that the CW had paid off the remaining drug debt of $32,000 at "my place," referring to Apartment 4D at 4 Winthrop Avenue, and that she had counted the money and confirmed the amount. Saury then explained to her how to prepare drugs for sale, as she told him, "I don't know how you are preparing it." During the same call, they discussed how much of the money they would keep as profit ($5,000), how Vasquez-Rodrigue had sent the earlier $10,000 payment to Riky's contacts through money remittances, and how they were to deliver the remaining money owed to Riky.

In WhatsApp messages spanning from January 8 to 13, 2021, Riky provided Vasquez-Rodrigue with more instructions for remitting money to additional people and instructing her to take

$150 for herself. Vasquez-Rodrigue sent Riky additional photographs of money remitter receipts spanning from January 8 to 12, 2021.

On January 14, 2021, agents arrested Vasquez-Rodrigue. They searched the apartment at 4 Winthrop Avenue pursuant to a search warrant that same day, where they found paperwork belonging to Vasquez-Rodrigue, as well as fentanyl and cocaine, a ledger used to account for drug transactions, and drug paraphernalia, including a bottle of lactose, which is used as a cutting agent to dilute narcotics, a blender with fentanyl residue on it, used in the cutting process, a scale used to measure the weight of narcotics, a mixing bowl, and corner-cut plastic baggies, which are used to package retail amounts of narcotics. Special Agent Fonseca testified that Vasquez-Rodrigue "received mail at [the 4 Winthrop Avenue] address." Vasquez-Rodrigue also voluntarily provided FBI agents with her two cell phones, allowing them to extract and review the data they contained.

Vasquez-Rodrigue chose to testify at trial, as described below. Although Vasquez-Rodrigue had named Saury as her "husband" in messages and phone calls, she said she "had split up with Saury" a long time ago and that they had never married. She first met Saury at a bar in 2016, after she had moved to the United States from the Dominican Republic, and their relationship lasted "[a]round one year." They lived together at two addresses: first

at 323 Howard Street for about three or four months, and then at the apartment at 4 Winthrop Avenue. The bills for the apartment were registered under Vasquez-Rodrigue's name because Saury "d[id]n't have documents." When the relationship ended, she was the one who moved out of the apartment at 4 Winthrop Avenue.[3] She moved in with her mother, sister, and stepfather at 61 Bradford Street, where she still lived at the time of the trial. At the time of his arrest, Saury was still living in the apartment at 4 Winthrop Avenue.

Vasquez-Rodrigue "wanted to help" Saury because she "still had feelings for him" and hoped that they would rekindle their relationship. After Vasquez-Rodrigue heard from a mutual friend named Jahira that Saury had been arrested, she and Jahira attempted "to find out where he had been taken to" and gather bail money for him. She also located a lawyer for Saury, "put[] money into his canteen" at the jail, and paid his apartment and utility bills. Saury also "asked [her] to get in touch with somebody called Cuba." Saury asked her to do this "[b]ecause he didn't have anyone to go to or to resort to when he got arrested. Many of his friends turned their backs on him."

---

[3]     Vasquez-Rodrigue testified that right after their relationship ended, Saury's new girlfriend moved into the apartment and placed the apartment utilities in her name. After Saury and this girlfriend broke up, the girlfriend took her name off the utility bill, and Vasquez-Rodrigue "let [Saury] use [her] name for the utility accounts" again.

Vasquez-Rodrigue testified that after Saury's arrest, Riky called her on her cell phone, the number for which he had gotten from a mutual acquaintance named Wanda. Riky "first asked [Vasquez-Rodrigue] about Saury." The two men were childhood friends who had spent time together in Santo Domingo, the capital city of the Dominican Republic, and often spoke socially on video calls. Saury had introduced Vasquez-Rodrigue to Riky as his girlfriend on one of these calls. Riky instructed Vasquez-Rodrigue to get another cell phone with a different number, which she did. After Vasquez-Rodrigue got the new cell phone, she and Riky began using that phone to discuss collecting the drug debt payment from the CW.

Vasquez-Rodrigue admitted in her testimony that, "[t]o help Saury," she agreed with Riky to collect the CW's drug debt payment from the CW, and then spoke with the CW to arrange a time and place for the collection; collected the $10,000 from Roladi on December 16, 2020, after failing to meet with the CW at the agreed upon place and time; and told the CW to only deliver money to her going forward, that Saury had left her in charge, and that she "underst[oo]d how everything moves" in the drug business. Between December 16 and 28, 2020, after she received the CW's $10,000 drug debt from Roladi, she transferred this money via money remitter service to names provided to her by Riky, and, at Riky's direction,

also remitted an additional $10,000 that she had found in the apartment at 4 Winthrop Avenue.

She admitted that "in the beginning of December," she made an agreement with Riky "to send him money and to take $50 per thousand" remitted. On cross-examination, she admitted that she met with the CW at 4 Winthrop Avenue on December 30, 2020, to collect an additional $32,000, and that after this she remitted more money at Riky's direction right up until she was arrested. She also admitted that Riky had not threatened her in their communications until after she had already received the first drug payment on December 16, 2020.

Vasquez-Rodrigue's duress defense is based on the following testimony. She testified, without specifying the date except that it was after collecting the first payment from the CW, that she had a "small argument" with Riky over the phone: "I told him that I didn't want to receive money anymore because I was feeling too stressed out, I had problems on another front and my head was not clear."[4] She testified that during this call, Riky "did threaten me." Riky said he knew where she lived, where her mother lived, and where her sister with autism, who he called "crazy," went to school. She found these statements threatening

_____

[4] The conversation occurred after she had collected the CW's first partial payment from Roladi and before she received the December 23, 2020, WhatsApp messages.

- 12 -

even though she knew Riky was in Mexico because he had "already told [her] he had people who knew [her] who wouldn't care about killing or doing whatever." After this conversation, she agreed to collect the remaining money that the CW owed.

To support her testimony, Vasquez-Rodrigue produced a screenshot photo of a December 23, 2020, WhatsApp conversation, which she testified took place after the phone call. In the screenshot (the authenticity of which the government challenged), Riky asked her to "try to convince" the CW to pay his remaining drug debt to her by telling him that her "husband" (Saury) had "left [her] in charge of everything." She agreed to do so but stated that she did not "want . . . more trouble" and that she hoped he would "let [her] be in peace like [she] was before" and that she "d[id] not like being in all these problems." He responded, "[y]ou tell him that you know what is moving and everything like I explained to you" and that "later[,] we'll see what we do with you[.]" When she asked what he meant, he stated, "[t]hat you have to do as I told you[.] [I]f you don't, you know what I told you would happen[.] Tell him everything I told you and don't even think about saying anything else beyond what I told you[.]" She interpreted these messages as a threat in the context of Riky's earlier statements about her family. She agreed to do what he said and told him, "me and my family[,] do not get us

- 13 -

involved[.]  If I do it[,] I will not do it for you and not for anybody I just ask you please let this be the last time[.]"

Vasquez-Rodrigue testified that the WhatsApp account on which she and Riky had exchanged the messages shown in the screenshot was temporary and had expired by the time she attempted to access the messages on January 20, 2021.  On cross-examination, she admitted that she had not done anything to ensure that she would have continued access to the account, even when sent a notice that the account would expire.  She also admitted on cross-examination that no threat appeared in the WhatsApp messages between her and Riky from December 9, 2020, through January 14, 2021, that were still accessible on her phone and found by the government, a message thread which totaled 151 pages.  This thread included other messages, all of which were non-threatening, that she and Riky had exchanged on December 23, 2020.  She also admitted that she had not mentioned Riky's threats to Saury in any of their jail calls, even though they spoke almost every day and sometimes multiple times a day.

Vasquez-Rodrigue made a number of inconsistent statements at trial.  She testified on direct that she did not know that the debt owed by the CW was for drugs or how much money was involved until she was about to collect the money, and "thought that maybe Saury had loaned [Riky] some money back from Santo Domingo or maybe he had pawned something for him."  She also

- 14 -

testified that she didn't know the kind or quantity of drugs involved until after she had collected the payment and made the statements to the CW about being left in charge. She changed her testimony on cross-examination and admitted that she knew that the $42,000 was a drug debt for one kilogram of fentanyl before she attempted to collect the money on December 16, 2020, around 10:00 a.m., based on a conversation with Saury earlier that morning at 8:43 a.m. She testified on direct that December 15, 2020, was the "first day that [she] understood [she] w[as] supposed to pick up money," but on cross-examination, she admitted that she had agreed with Riky to accept the first payment from the CW in a phone call on December 10, 2020. She also testified that she was not involved in any discussion about additional drugs being delivered between December 16 and 30 and that when asked about additional drugs by the CW on December 19, 2020, she "didn't understand what he wanted, so [she] just told him [she was] going to call [Riky]." However, she then testified that on December 19, 2020, she told the CW that she would not provide him with any more drugs "until 20 or 25 [thousand] of the [initial drug payment] is delivered," and admitted on cross-examination that she had already spoken to the CW about him potentially getting more drugs by December 23, 2020.

Further, Vasquez-Rodrigue testified on direct that she had not known Saury was a drug dealer during their relationship but admitted on cross-examination that she had been aware he was

- 15 -

dealing drugs while they were together. She testified that she sold several small bags of cocaine that she had found at the 4 Winthrop Avenue apartment to a woman named Omayra, beginning on December 23, 2020, but claimed that Saury did not know of this. She later admitted on cross-examination that Saury had known that she sold cocaine. She also testified that she was not responsible for certain messages on her phone about selling cocaine because on the days they had been sent, she had lent her phone to a friend and did not have access to it. She admitted on cross-examination that she had sent messages to Riky from this phone on the same day and at the same time as the other messages were sent, implying that her earlier statement was a lie.

## B.

The government filed a pretrial motion in limine to preclude Vasquez-Rodrigue from introducing evidence at trial with respect to the defense of duress or referencing this defense in her opening or closing arguments, arguing that she would be unable to meet her burden of production to satisfy any of its elements. The defendant filed a response opposing the motion, arguing that the trial court should allow her to present a duress defense to the jury because there was sufficient evidence to plausibly support it. At the final pretrial conference, the district court stated that it would assess whether a duress jury instruction was appropriate after considering the trial evidence. The parties

agreed there was a four-part test for a duress instruction, described infra.

At a charge conference on the fifth day of the six-day trial, the district court held that it was "prepared to accept, although not without some doubts," that Vasquez-Rodrigue had satisfied her burden on the first two prongs of the duress test: that she had "acted under immediate threat" and "that she had a well-grounded belief . . . measured by an objective standard that the threat would be carried out." The court found that she had failed, however, to show that a reasonable jury could find that she had met the threshold requirements of the third and fourth duress requirements: that she did not have "a reasonable opportunity to escape or otherwise frustrate the threat," and that she did not "intentionally or recklessly place[] herself in a situation where it would be probable she would be subject to such duress." This was because Vasquez-Rodrigue had had "an opportunity to go to law enforcement for protection or to frustrate the threat," which undermined the third requirement, and because she had voluntarily participated in the conspiracy "for the better part of a month" before being threatened, despite the objective risk of probable duress inherent in getting involved with a drug organization, which undermined the fourth requirement. The court thus declined to give a jury instruction on duress.

The jury found Vasquez-Rodrigue guilty and "that the conspiracy involved 400 grams or more of a mixture or substance containing a detectable amount of fentanyl that was attributable to, or reasonably foreseeab[le] to" her. The court sentenced her to forty-five months in prison, followed by three years supervised release and $100 special assessment, considerably less than the statutory maximum of life in prison, see 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vi), 846; see also 18 U.S.C. § 3553(a), (f), and the sentencing guideline range of seventy-eight to ninety-seven months. She timely appeals.

## II.

### A.

As to Vasquez-Rodrigue's first argument, we review a district court's denial of a requested jury instruction de novo.[5] United States v. Diaz-Castro, 752 F.3d 101, 108 (1st Cir. 2014). At trial, the parties agreed that under this circuit's law, a

---

[5] We review a district court's denial of a jury instruction de novo when the defendant has properly preserved his or her objection to the denial of the instruction. United States v. Dávila-Nieves, 670 F.3d 1, 9 (1st Cir. 2012) (citing United States v. Vasco, 564 F.3d 12, 18 (1st Cir. 2009)). While the parties disagree about whether defense counsel properly preserved at trial Vasquez-Rodrigue's objection to the court's denial of her duress jury instruction, we need not decide this issue on appeal, as the government has agreed to de novo review. United States v. Encarnacion-Ruiz, 787 F.3d 581, 586 (1st Cir. 2015) ("When the government fails to request plain error review, we, and many of our sister circuits, review the claim under the standard of review that is applied when the issue is properly preserved below.").

defendant requesting a duress jury instruction bears a four-part burden. The defendant must show that she "committed a crime as a result of (1) an immediate threat of serious bodily injury or death (2) that the defendant reasonably believed was true, (3) without a reasonable opportunity to escape or frustrate the threat," and (4) that she did not "'recklessly place[] [her]self in a situation in which it was probable that [s]he would be subjected to duress.'" Diaz-Castro, 752 F.3d at 108 (quoting United States v. Castro-Gomez, 360 F.3d 216, 219 (1st Cir. 2004)); United States v. Arthurs, 73 F.3d 444, 448 (1st Cir. 1996). We address only the ruling that she failed to meet the fourth prong.

The district court did not err in concluding that Vasquez-Rodrigue has not shown that she did not either intentionally or recklessly place herself in a situation in which it was probable that she would be subjected to duress when she voluntarily joined and participated in the drug conspiracy for weeks before she experienced any of the threats she alleged.

As this Court held in Diaz-Castro, a defendant cannot claim duress where she "voluntarily came to the two locations to participate in the drug deals" and there was "no evidence that . . . [s]he was threatened before making the initial choice to participate." 752 F.3d at 108. Similarly, in United States v. González-Pérez, 778 F.3d 3 (1st Cir. 2015), we held a duress defense was unavailable where the defendant "ma[de] himself

available" to and "at [the] service" of a known drug dealer "not once, but numerous, times." Id. at 15.

Here, the record shows that by the time Vasquez-Rodrigue alleges she was threatened by Riky on December 23, 2020, she had already completed the crime of conspiracy. See United States v. Podlog, 35 F.3d 699, 704 (2d Cir. 1994) (finding the appellant was not entitled to a duress instruction "because conspiracy is an inchoate crime" and the appellant had failed to "demonstrate that the necessary threatened force was present at the time of his agreement to participate in the conspiracy"). She did so by agreeing on December 10 to collect the CW's first drug debt payment, coordinating the time and location of the payment with the CW on December 15, collecting the money from Roladi on December 16, and remitting thousands of dollars through thirty transactions to individuals in Mexico and the Dominican Republic at Riky's direction between December 16 and 22. During this time, she represented herself to the CW as Riky's intermediary and Saury's replacement, stating on December 16 that Saury had "left [her] in charge" because "I more or less understand the business, I understand how everything moves," and directing him to make all future drug debt payments to her alone. On December 19, she further told the CW that Riky "is going to communicate with you through me" and that the CW needed to pay "at least 20 or 25" thousand dollars of his drug debt before she and Riky would provide

- 20 -

him with more fentanyl, but once he had paid, she would send the money to Riky, and Riky would send it to his drug suppliers, after which they could provide the CW with more drugs.

Vasquez-Rodrigue argues that she did not recklessly place herself in a situation in which duress was probable because when she joined the conspiracy, "she was unaware of the dangers that lay ahead." This argument, premised on her subjective state of mind, fails. The duress inquiry "hypothesizes a defendant of ordinary firmness and judgment and asks what such a defendant was likely to have experienced or how such a defendant was likely to have acted." Castro-Gomez, 360 F.3d at 219. Vasquez-Rodrigue was informed by Saury early on, before she attempted to collect the initial payment from the CW, that the money was to repay a drug debt owed to Saury totaling $42,000 for one kilogram of fentanyl. By her own account, Saury was jailed, and she had not become engaged to him, had broken up with him, and had not lived with him for nearly a year. She easily could have declined to collect the debt. But she did not choose to walk away; rather, she took pains to ensure the collection happened. When she failed to collect the payment from the CW, she could have not pursued it further, but she chose the opposite course. At some effort, she collected the money from Roladi and warned the CW never to pay anyone but her again. After that, she took further steps to advance the conspiracy, remitting the CW's payment to Riky's contacts in Mexico

and the Dominican Republic.[6]   A reasonable person in Vasquez-Rodrigue's position would have understood from the outset the danger of getting involved with a drug conspiracy, especially one selling kilogram amounts of drugs and exporting tens of thousands of dollars of cash out of the country.[7]   See id.; see also Diaz-Castro, 752 F.3d at 108-09.   We reject the implication of her argument that drug dealers can set up duress defenses for their conspirators by making threats well after the conspirators have voluntarily signaled their willingness to join the conspiracy.

**B.**

Vasquez-Rodrigue separately argues that a different duress test, imposing fewer burdens on the defendant, should apply in cases such as hers in which "the sole charged offense is the inchoate crime of conspiracy."   Our case law has already rejected that argument.   The First Circuit has routinely applied the established duress test in conspiracy cases.   See, e.g., Diaz-Castro, 752 F.3d at 108-09; Castro-Gomez, 360 F.3d at 217, 219;

---

[6]   Vasquez-Rodrigue also argues that she did not know that this drug deal was connected to Sinaloa and Mexico until she began sending the remittances and saw the names and addresses of the recipients on December 16, 2020, but she continued to send these remittances until she was arrested on January 14, 2021, nearly a month after discovering this connection, and she had committed the crime of conspiracy even before then.

[7]   The case does not involve the very separate issue of attempts of a defendant to withdraw from a conspiracy before the amount of drugs dealt triggers statutory sentencing consequences.

González-Pérez, 778 F.3d at 10-11; United States v. Amaro-Santiago, 824 F.3d 154, 158, 166 (1st Cir. 2016); United States v. Vázquez, 724 F.3d 15, 18, 27-28 (1st Cir. 2013). She has presented no argument as to why the law of the circuit doctrine does not bar her claim.

Further, none of the cases to which Vasquez-Rodrigue cites actually applies her proposed duress test to a conspiracy offense. See United States v. Leahy, 473 F.3d 401 (1st Cir. 2007) (not creating an exception for conspiracy crimes from its four-part duress standard); Slater v. United States, 562 F.2d 58, 62 (1st Cir. 1976) (noting merely that the "economic threat" of an implied threat to harass a contractor and withhold future contracts from him "would not negate the agreement that is a necessary element of every conspiracy" because it "was not enough to overbear the contractor's will and make his participation in the conspiracy involuntary"); United States v. Freeman, 208 F.3d 332, 342 (1st Cir. 2000) (commenting that "'a generalized fear of harm' is no defense to a conspiracy charge" and that "[e]vidence precluding the inference of an agreement would have to show that the duress to which [the alleged conspirator] was subject was 'enough to overbear [her] will and make [her] participation in the conspiracy involuntary'" (first quoting United States v. Alzanki, 54 F.3d 994, 1003 (1st Cir.1995); and then quoting Slater, 562 F.2d at

62)); <u>United States</u> v. <u>Dwyer</u>, 238 F. App'x 631, 643 (1st Cir. 2007) (same).

**III.**

For the reasons stated above, we **<u>affirm</u>**.